# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

AGLAED GONZALEZ RIVERA,

Plaintiff,

v.

CENTRO MEDICO DEL TURABO, INC. D/B/A HOSPITAL HIMA-CAGUAS, et al.,

Defendants.

CASE NO. 15-1538 (GAG)

## OPINION AND ORDER

Aglaed Gonzalez Rivera ("Plaintiff") filed this medical malpractice suit for injuries endured as a result of the allegedly negligent medical care afforded to her by the medical staff at Centro Medico Del Turabo, Inc. d/b/a HIMA San Pablo-Caguas ("HIMA Hospital"); Grupo HIMA San Pablo Inc., Omega Anesthesia PSC, Dr. Francisco Golderos-Sanabria, Dr. Geovannie Marcano-Centeno and Dr. Hector Berrios-Echevarria[1] (collectively "Defendants"). (Docket No. 1). The events that led to the filing of this complaint date back to March 15, 2010, when Plaintiff—at the time three months pregnant—experienced pelvic pain and slight vaginal bleeding, and was taken to the emergency room at HIMA Hospital in Caguas, Puerto Rico. Id.

Presently before the Court is Defendants' Motion in Limine seeking to exclude the testimony of Plaintiff's proposed expert witness, Dr. Carlos Lasalle-Nieves ("Dr. Lasalle"). (Docket No. 48).

---

[1] The claims against Hector Berrios-Echevarria were voluntarily dismissed by Plaintiff. (Docket Nos. 42 & 43.)

**Civil No. 15-1538 (GAG)**

Plaintiff responded in opposition. (Docket No. 54). Per leave of Court, Defendants replied and Plaintiff sur-replied. (Docket Nos. 57 & 60).

I. **Background**

On May 6, 2015, Plaintiff, a resident of the state of Connecticut, filed the above-captioned complaint, invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332, against Defendants alleging medical malpractice and seeking damages for her injuries, pursuant to Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. LAWS ANN. tit. 31, § 5141. (Docket No. 1).

For contextual benefit, the Court summarizes Plaintiff's factual allegations. (Docket No. 1 ¶¶ 10-53). Plaintiff arrived at HIMA Hospital emergency room experiencing pelvic pain and slight vaginal bleeding. She was seen by an emergency physician, Dr. Geovannie Marcano-Centeno and Dr. Berrios, Plaintiff's obstetrician.

While at the emergency room, Plaintiff's condition worsened, she began to experience profuse and abundant vaginal bleeding. After conducting an examination, Dr. Berrios diagnosed Plaintiff with a miscarriage—an incomplete *spontaneous abortion*—that required surgical evacuation by cutterage. Plaintiff underwent surgery and was administered spinal anesthesia.

Plaintiff alleges that as a result of spinal anesthesia that was administered for the surgery, she suffered a perforation in her spinal cord that left her in a paraplegic state—completely paralyzed from the waist down. Plaintiff and her husband left HIMA Hospital in the morning hours of March 16, 2010. She alleges that when she left HIMA Hospital she was still in pain and was unable to walk. Plaintiff returned to HIMA Hospital on March 17, 2010, where she was examined by Dr. Marcano and ultimately admitted to HIMA Hospital until April 3, 2010, when she was transferred to Health South Rehabilitation Center. Plaintiff was discharged from Health South on April 17,

**Civil No. 15-1538 (GAG)**

2010. According to Plaintiff's allegations, she has been unable to move her legs, has not regained sensation from the waist down, and has been permanently confined to a wheelchair since the March 15, 2010 surgery.

In light of the above, Plaintiff claims Defendants "breached the standards of proper medical care generally recognized in the medical profession and expected from a reasonably competent physician in like circumstances" by: (1) failing to timely diagnose Plaintiff's medical condition, (2) negligently administering —failing to adequately administer— the spinal anesthesia, (3) failing to advise Plaintiff about the risks inherent to the spinal anesthesia, as a result of which she was unable to provide informed consent, (4) failing to adhere to Plaintiff's wish of not being administered spinal anesthesia, (5) failing to provide adequate post-operative care and monitoring her postoperative condition, (6) discharging Plaintiff while she was still suffering neurological deficiencies, and (7) failing to timely diagnose Plaintiff's neurological deficiencies. (Docket No. 1 ¶¶ 55-67). Consequently, Plaintiff posits Defendants' negligent acts and/or omissions caused her injuries that led to her permanent paraplegic condition. (Docket No. 1 ¶ 11).

## II. <u>Legal Analysis</u>

Defendants move to exclude the testimony of Plaintiff's expert witness, Dr. Lasalle as lacking sufficient reliability because it is baseless, premised on inaccurate and incorrect facts, and irrelevant. (Docket No. 48). Namely they posit that said testimony is unrealiable because Dr. Lasalle reviewed only a portion of Plaintiff's medical records, that it is lacking in factual foundation, and last but not least —the shocking plot twist in this case— Plaintiff is not paraplegic, which means that his opinion is based on an incorrect factual assumption. (Docket No. 48). Consequently, Defendants contend that Dr. Lasalle's testimony should be excluded, pursuant to

Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharm. Inc.</u>, 509 U.S. 579 (1993). (Docket No. 48).

In opposition to Defendants' motion in limine, Plaintiff posits that Defendants are not entitled to the exclusion of Dr. Lasalle's testimony because his testimony is reliable under the <u>Daubert</u> standard and that it is based on sufficient underlying facts and data. (Docket No. 54). Moreover, Plaintiff contends that Defendants' complaints go to the weight of the testimony rather than to its admissibility and are strictly related to the persuasiveness and credibility of Dr. Lasalle' expert opinion, and questions of persuasiveness and credibility are properly reserved for the jury. Lastly, Plaintiff posits that Dr. Lasalle's testimony will help the jury to determine both the proper standards of case and the causal nexus between Defendants' negligence and Plaintiff's damages. (Docket No. 54).

### A. The Daubert standard

Federal Rule of Evidence 702 governs the admission of expert testimony. Rule 702 requires expert testimony be (1) "based on sufficient facts or data;" (2) "the product of reliable principles and methods;" and (3) that the witness apply "the principles and methods reliably" to the particular facts of the case. FED R. EVID. 702. The trial court serves a gatekeeping function to ensure the witness's "specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue[.]" <u>Id.</u>; <u>Pagés-Ramirez</u>, 605 F.3d at 113 (citing <u>Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar</u>, 345 F.3d 15, 24 (1st Cir. 2003).

Dr. Lasalle's qualifications are not at issue here.[2] The Court's analysis turns to the congruity of the data used by the proposed expert. "The judge, as a gate-keeper, must ensure an expert's

---

[2] Dr. Lasalle graduated on 2010 from the Anesthesiology Residency, University of Puerto Rico. (Docket Nos. 46 ¶ 1; 54-2 ¶ 1). This is the first time Dr. Lasalle has ever been consulted as a proposed expert witness to review a case. (Docket Nos. 46 ¶ 2; 54-2 ¶ 2). Dr. Lasalle issued his medical opinion in this case under the

testimony is *relevant, sufficient* and is based on a *reliable* foundation." See Daubert., 509 U.S. at 597; U.S. v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002). It is the Court's duty to ensure the Daubert standard is met before allowing any expert testimony. "Many aspects of science are a mystery to laymen without the aid of experts. In the world of the blind, the one-eyed man is king; and Daubert relevancy is the sentry that guards against the tyranny of experts." Vargas v. Laguer, No. Civ No. 14-1597 (CVR), 2017 WL 1230303, at *8 (D.P.R. Mar. 24, 2017) (quoting Samaan v. St. Joseph Hosp., 670 F.3d 21, 35 (1st Cir. 2012)).

While the general focus of this inquiry is on the principles and methodology relied upon by the expert, the Court may consider the congruity of the data and the opinion proffered by the expert. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (holding that a court may conclude there is too great an analytical gap between data and the opinion proffered); Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998). "Proponents . . . do not have to demonstrate that the assessments of their experts are correct, only that their opinions are reliable." Rivera-Cruz v. Latimer, Biaggi, Rachid & Godreau, LLP, 2008 WL 2446331, at *2 (D.P.R. June 16, 2008) (citing Ruiz-Troche, 161 F.3d at 81.).

It is fundamental that "expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion. Thus*, an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation*." Damon v. Sun Co., 87 F.3d 1467, 1474 (1st Cir. 1996) (internal citations and quotations omitted) (emphasis added).

---

letterhead from the institution Key Biscane Surgery Center. Key Biscane Surgery Center did not authorize Dr. Lasalle to issue any medical expert opinion in any private cases, nor in this case. Dr. Lasalle served as a private contractor administering anesthesia for this institution. (Docket Nos. 46 ¶ 4; 54-2 ¶ 4). Dr. Lasalle has not published any medical literature or article related to medicine. (Docket Nos. 46 ¶ 5; 54-2 ¶ 5). Dr. Lasalle is not board certified as an anesthesiologist. (Docket Nos. 46 ¶ 6; 54-2 ¶ 6).

> The word "sufficient" signifies that the expert may properly base her opinion on something less than all the pertinent facts or data. Thus, sufficiency is not a matter of whether the judge believes in the facts or data on which the expert relies.
> Rather, sufficiency is a function of the nature and scope of the opinion offered, the quantity of data both available and pertinent to the issue at hand, and what is deemed sufficient by experts in the pertinent field when working outside the courtroom. Included in the analysis under Rule 702(b) should be whether the expert ignored a significant portion of seemingly important data. . . . If an expert "cherry picks" favorable data in this manner but ignores a significant quantity of other important facts, the trial court would be justified in concluding that the expert's testimony is not based on sufficient facts or data.

29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268 (2nd ed. 2017).

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. 579, 591 (1993). As to the relevancy criterion, "expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) (citing Daubert, 509 U.S. at 591–92).

"[C]horeographing the Daubert pavane remains an exceedingly difficult task. Few federal judges are scientists, and none are trained in even a fraction of the many scientific fields in which experts may seek to testify." Ruiz-Troche, 161 F.3d at 81. "Moreover, even though Daubert and its progeny require trial judges to evaluate the level of support provided by complex scientific studies and experiments in myriad disciplines, reliability and relevance remain legal judgments." Ruiz-Troche, 161 F.3d at 81.

Trial courts must also ensure that expert testimony is tied to the facts of the case in a way that aids the jury in carrying out its fact-finding functions. See Daubert 509 U.S. at 591 (expert testimony which does not "fit" the facts of the case is "not relevant and, ergo, not helpful"); Milward

Civil No. 15-1538 (GAG)

v. Rust-Oleum Corp., 820 F.3d 469. 473 (1st Cir. 2016) (courts must "serve as the gatekeeper for the expert testimony by 'ensuring that [it] . . . both rests on a reliable foundation and is relevant to the tasks at hand.'") (quoting Daubert, 509 U.S. at 597).

### B. Dr. Lasalle's expert opinion

Dr. Lasalle theorizes that Plaintiff's alleged paraplegia was most likely caused by a spinal cord infarct. According to Dr. Lasalle, Plaintiff suffered a spinal cord infarct when she developed hypovolemia[3] as a result of her "abundant blood loss" that, in turn, led to the hypoperfusion[4] of her spinal cord, which rendered her "paraplegic immediately after the anesthesia." (Docket No. 48 at 14-15).

Dr. Lasalle reached this conclusion by deductive reasoning—ruling out all other possible scenarios— according to the information he had about Plaintiff's case. In his deposition testimony, Dr. Lasalle provided details as to the factual basis of his expert opinion. Correspondingly, Defendants' point to the facts that were missing from his consideration. The Court now turns to analyze whether Dr. Lasalle's expert opinion meets the Daubert reliability threshold.

In sum, Defendants argue Dr. Lasalle's opinion is unreliable, insufficient and irrelevant because: (1) Dr. Lasalle's opinion is based on his assumption that Plaintiff suffers from paraplegia as an alleged result of the surgery and anesthesia procedures of March 15, 2010; (2) Dr. Lasalle did not examine Plaintiff and has no knowledge of her current physical condition; (3) Dr. Lasalle did not deem necessary to examine any medical records regarding the patient's recuperation or subsequent treatment, except for the medical records regarding the events in the complaint on

---

[3] *Hypovolemia* is defined as "abnormally decreased volume of circulating blood in the body; the most common cause is hemorrhage." See W. A. Newman Dorland DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 900 (Saunders, 30th ed. 2003)).

[4] *Hypoperfusion* is a decreased perfusion of blood through an organ, as in hypovolemic shock; if prolonged, it may result in permanent cellular dysfunction and death. Newman Dorland supra n.3 at 896.

Civil No. 15-1538 (GAG)

March 15, 2010. (Docket No. 46 ¶ 7); (4) Dr. Lasalle based his opinion on his subjective impression of the nurse's note.

The proposed expert explained his opinion was based on the fact that patient was paraplegic. Defendants contend that Plaintiff is not paraplegic, she has leg movement and can walk. Defendants provide evidence in support of said assertion. (Docket Nos. 46 ¶ 19; 54-2 ¶ 19; 54-4 at 208, 210-11). Dr. Phillip P. Smith, physician at the Urology Division in UConn Health examined Plaintiff on September 9, 2014, and specifically concluded on her record the following: "No evidence of spinal etiology to her urinary dysfunction, this seems to be a cognitive disorder (note: sympathetic suppression of detrusor during filling seems intact)." (Docket Nos. 46 ¶ 26).

On May 20, 2015 (a mere two weeks after the compliant of caption was filed), neurologist Dr. Beverly N. Greenspan at the Neurology Department at UConn Health examined Plaintiff, and recorded in the patient's medical record "[T]oday patient is walking normally in the hall". See UConn Health Medical Record. (Docket Nos. 46 ¶ 28).

Dr. Greenspan examined Plaintiff again on October 16, 2014, and noted the following in her medical record:

> Assessment: Weakness of both legs (729.89).
> Impression This is an embellished examination in that the vibration sensation ceasing rapidly on the left forehead but persisting strongly for longer on the right is not explicable physiologically as the frontal bone vibrates as a unit whether the tuning fork is placed to the left or right of the midline. It is also not possible for a person to support their weight and stand without help if they have total loss of muscle power in both lower limbs. Also it would be extremely unusual if not impossible for a person to have paraplegia with a t10 sensory level and retain control of bowel and bladder function. Also a person with total paralysis of the lower limb muscles for 4 years would have some atrophy of the muscles, which she does not have.
>
> […]
>
> It is very unusual that you can stand without your knees buckling if you have no strength in your legs. This shows that there must be some strength in the muscles and I will refer you to physical therapy to help you gain control of this strength that is present so you can improve the use of your legs. You have had MRI scans of your

8

spinal cord which did not show anything to explain your lack of feeling and control of muscles in the legs, and I appreciate the pictures on the CD of the MRI of your brain done with and without contrast dye, and it appears normal to me including the optic nerves.

(Docket No. 46 ¶ 27). Defendants posit that in her deposition testimony, Plaintiff admits she is not paraplegic and, according to her, has walked since early 2015. (Docket Nos. 46 ¶ 29). Even though Plaintiff's current neurologist recommended her to see the psychiatrist, she has not sought an appointment. (Docket Nos. 46 ¶ 30). The following excerpt from Dr. Lasalle's deposition testimony is especially revealing.

> Q    Is the patient paraplegic?
>
> A    Well, according to this, yes.
>
> Q    And by paraplegic I mean that she has no movement on her lower extremities.
>
> A    According to the medical record, yes.
>
> Q    That she had no reflexes in her lower extremities?
>
> A    According to the medical record, yes.
>
> Q    If --
>
> EXAMINATION BY MR. MARTÍNEZ:
>
> Q    Doctor, can you pinpoint the onset of that condition?
>
> A    Well, depending on the trauma. I mean, if it is a severe -- I mean, if you have, let's say, a tumor in this condition --
>
> Q    In this case.
>
> A    In this case, it looks like it was cute.
>
> Q    Meaning what?
>
> A    Less than -- I mean, I don't know exactly, but she never -- it looks like she never got sensation or movement after the spinal anesthesia. So I would say immediately after the spinal anesthesia.
>
> Q    So you would say, according to what you understand, her onset was immediately upon the anesthesia?

**Civil No. 15-1538 (GAG)**

| | | |
|---|---|---|
| A | Upon spinal anesthesia because she never got -- as per the record, she never got sensation or movement after the spinal anesthesia. I mean you have to wear off the spinal anesthesia, but -- |
| Q | And that was for how long? |
| A | As an average, spinal anesthesia, I would say two hours, two hours and a half. |
| Q | So if she had didn't have it within four hours, then it would not be related to the anesthesia? |
| A | No, it should be -- I mean, something happened in the anesthesia that caused paraplegia. The patient was walking before and was paraplegic after spinal anesthesia. |
| Q | As to your understanding, if she was not paraplegic immediately after the anesthesia wearing off, then it is not related to the anesthesia? |
| A | No. You can have paraplegic after also. If you have hematoma, you develop the hematoma in 24 hours -- 12 hours, 24 hours. |
| Q | Do you have evidence of hematoma? It didn't say anything in the MRI. |
| A | No. In this patient, there is no evidence of hematoma. |
| Q | There is no evidence? |
| A | There is no evidence. You should expect that, but there was no evidence. |

(Docket No. 54-4, at 139-141). Dr. Lassalle admitted in his deposition that if the paraplegia was not of immediate onset he would have to change his opinion.

| | | |
|---|---|---|
| Q | If you had evidence that she had no problems and the onset was not upon the administration of anesthesia, then you would have to change your opinion? If the onset was not as you say and there was no hematoma. |
| A | Well, my opinion is the hypovolemia contributed to cord infarct. |

Civil No. 15-1538 (GAG)

> Q  Because you are assuming that she could not walk afterwards, but if the evidence showed that she walked afterwards, your opinion would change?
>
> A  Yes.

(Docket No. 54-4, at 143).

Paraplegia is defined as "paralysis of the lower limbs and lower trunk." W. A. Newman Dorland DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1368 (Saunders, 30th ed. 2003). In turn, *paralysis* is defined as "loss or impairment of motor function in a part due to lesion of the neural or muscular mechanism." Newman Dorland supra at 1364. According to Dr. Lasalle, paraplegia in medical terms is defined as the condition in which a patient is impaired in his lower extremities with no muscle movement, no reflexes, and no sensation. The patient suffers muscle atrophy and uncontrolled voiding. (Docket Nos. 46 ¶ 18; 54-2 ¶ 18; 54-4 at 78. 80, 92, 139).

Under those circumstances, the record supports Defendants contention that Plaintiff is not in fact is not paraplegic. Hence, Dr. Lasalle's expert opinion premised on his assumption that Plaintiff was paraplegic is troublesome. "An expert opinion grounded on a nonexistent fact is not significantly probative." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 8 (1st Cir. 2010) (citing Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005) (holding that expert opinion based on "incorrect factual assumptions" was insufficient to create triable issue of fact)).

Dr. Lasalle did not deem it necessary to examine any medical records regarding the patient's recuperation or subsequent treatment, except for the medical records regarding the events in the complaint on March 15, 2010. (Docket No. 46 ¶ 7). Dr. Lasalle has not examined the patient. (Docket Nos. 46 ¶ 8; 54-2 ¶ 8) and does not know the current status of her medical condition, nor does he consider it necessary to know her current status. (Docket Nos. 46 ¶ 9; 54-2 ¶ 9).

Despite the lack of evidence, Dr. Lasalle's "ruling out" methodology points to Plaintiff's hypovolemic condition as the factor that most likely caused the harm–hypoperfusion of the cord.

There is no objective evidence of "abundant blood loss." The only reference in which Dr. Lasalle bases his opinion to support the alleged blood loss is a nurse note that states that the patient suffered abundant vaginal bleeding. (Docket Nos. 46 ¶ 12; 54-2 ¶ 12). The Court finds that Dr. Lasalle's hypoperfusion theory is a product of *speculation from an insufficient evidentiary foundation.*" Damon, 87 F.3d at 1474 (emphasis added). Dr. Lasalle admits there is no medical record which indicates Plaintiff had lost significant blood volume. (Docket No. 46 ¶ 10). The MRI that was performed on the patient showed there was no hematoma, and Dr Lasalle admits there is no evidence on the medical record of a hematoma. (Docket Nos. 46 ¶ 11; 54-2 ¶ 11).

In her complaint, Plaintiff alleged she suffered a perforation in her spinal cord. As Plaintiff's expert recognized multiple times in his deposition, the MRI that was performed on the patient did not show presence of a hematoma. As such, Defendants posit Dr. Lasalle veered away from the spinal cord perforation theory as he admitted there is no evidence on the medical record of a hematoma. (Docket No. 48 at 12).

The Court finds that, considering the above, Dr. Lasalle's opinion is unrealiable and insufficient as it is lacking in factual foundation and based on the proposed witnesses' speculation. This is not because of a flawed scientific principle—that abundant loss of blood can cause a spinal cord infarct—but because there was no substantial basis for concluding that it occurred here, much less by ruling out the possible causes according to an incomplete representation of the patient's medical condition. Given these reasons, Dr. Lasalle's proposed expert opinion does not meet the Daubert standard. It is unreliable and it would not assist the trier of fact. See Vadala v. Teledyne Indus., Inc., 44 F.3d 36, 39 (1st Cir. 1995).

Although exclusion of an expert is a severe sanction, it is not all that uncommon. Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 n. 6 (7th Cir. 1998) ("Expert reports must not be sketchy,

**Civil No. 15-1538 (GAG)**

vague, or preliminary in nature."); Kerlinisky v. Sandoz Inc., 783 F.Supp.2d 236, 242 (D. Mass. 2011) (striking expert report that failed to "provide with any reasonable degree of specificity the basis and reasons for [the expert's] opinions"); Elder v. Tanner, 205 F.R.D. 190 (E.D. Tex. 2001) (striking report under Rule 26 for failing to discuss the expert's reasoning and thought process, and under Daubert for making "conclusory statements" that lacked "any elaboration or reasoning"); Santiago-Díaz v. Laboratorio Clínico y de Referencia del Este, 456 F.3d 272, 276 (1st Cir. 2006) (affirming the district court's striking of a conclusory expert report, and holding that the "baseline" sanction for such a failure is preclusion of the evidence).

It is the Court's duty to ensure the Daubert standard is met before allowing any expert testimony. "Many aspects of science are a mystery to laymen without the aid of experts. In the world of the blind, the one-eyed man is king; and Daubert relevancy is the sentry that guards against the tyranny of experts." Samaan v. St. Joseph Hosp., 670 F.3d 21, 35 (1st Cir. 2012).

### III. Conclusion

In sum, the Court finds that Dr. Lasalle's testimony and report fail to comply with the Daubert standards. Thus, the Court cannot allow Dr. Lasalle's testimony or his report to be admitted. For the reasons stated above, the Court **GRANTS** Defendants' motion in limine at Docket No. 48.

**SO ORDERED.**

In San Juan, Puerto Rico this 18th day of September, 2017.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge